UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CAPITAL SHIELD, INC.,

             Plaintiff,

v.                           Case No:  2:24-cv-1003-JES-DNF

AMWINS ACCESS INSURANCE
SERVICES, LLC, and PELEUS
INSURANCE COMPANY,

             Defendants.

_____

## OPINION AND ORDER

On October 28, 2024, Plaintiff Capital Shield, Inc. ("Capital Shield") filed a federal complaint against Defendant Amwins Access Insurance Services, LLC ("Amwins") basing federal jurisdiction on complete diversity of citizenship (Doc. #1).  Amwins filed a Motion to Dismiss for lack of subject matter jurisdiction (Doc. #11).  Capital Shield responded by filing a motion for leave to file an amended complaint, indicating that it sought to plead antitrust claims under the Sherman Act and to add a new defendant (Doc. #21).

On February 20, 2025, the Court dismissed the original complaint without prejudice for lack of subject matter jurisdiction (Doc. #24).  In that Order the Court allowed Capital Shield to file an amended complaint clarifying diversity of citizenship and jurisdiction at the time of filing, but stated that Capital Shield would need to file a renewed motion for leave to amend if it wanted to add a new party and add a federal claim

(Id.).

On February 27, 2025, Capital Shield filed its First Amended Complaint (Doc. #25), along with a renewed motion for leave to file a second amended complaint (Doc. #26) seeking to plead claims under the Sherman Act and to add a new defendant. The magistrate judge denied the renewed motion for leave in an endorsed order on March 3, 2025, for failure to confer with opposing counsel. That same day Capital Shield filed another Renewed Motion for Leave to File a Second Amended Complaint (Doc. #33). The proposed Second Amended Complaint asserted claims against both Defendant Peleus Insurance Company ("Peleus") and Amwins (collectively "Defendants"), asserting violations of Section 1 of the Sherman Act as the basis for federal jurisdiction (Doc. #33). The Court granted Capital Shield's motion in an Order filed on April 28, 2025 (Doc. #49). On May 6, 2025, Capital Shield filed the Third Amended Complaint ("TAC") (Doc. #54), which is now the operative pleading. The TAC does not rely on diversity of citizenship as a basis for subject matter jurisdiction. (Id., ¶ 13.)

On June 12, 2025, Amwins filed a Motion to Dismiss the Third Amended Complaint (Doc. #69) and Peleus filed a Motion to Dismiss Count One of the Third Amended Complaint (Doc. #75). Capital Shield filed a consolidated Response in Opposition to Defendants'

Motions to Dismiss (Doc. #84).[1]  After careful review, both motions are granted as set forth below, the TAC is dismissed without prejudice, and plaintiff is granted leave to file a fourth (and final) amended complaint.

## I.

Unless otherwise indicated, the following factual summary of relevant material facts is taken from the TAC (Doc. #54), the operative pleading in this case.

In approximately 2017-2018 Capital Shield executed a series of contracts to launch a new insurance product in which W.R. Berkley Corporation ("Berkley") was to be the main underwriter of the product and MarketScout Corporation ("MarketScout") was to be the wholesaler to distribute the product.  (Id., ¶¶ 18, 24.)  In 2020, at the onset of the COVID pandemic, Capital Shield faced logistical challenges to a full-scale launch of its new insurance product and Berkley terminated its participation as the lead underwriter.  (Id., ¶¶ 32, 33.)  After being solicited by Amwins to market and sell the new insurance product (id., ¶ 34), Capital Shield terminated MarketScout's contract and effectively started over.  (Id., ¶ 35.)

---

[1] With leave of the Court, Defendants also filed Replies on August 15, 2025 (Docs. #89, #90), and Capital Shield filed a Consolidated Sur-Reply (Doc. #93).

On June 1, 2022, Capital Shield entered into a Program Administrator Agreement ("the PAA") with Amwins and Peleus to re-launch the casualty insurance product developed by Capital Shield. (Doc. #54, ¶ 38.)  This insurance product provided supplemental coverage for "policyholder invested assets when a FINRA Approved investment advisor/asset manager embezzles funds."  (Id., ¶ 31.) The PAA designated Amwins and Capital Shield as co-program administrators "responsible for, among other things, the marketing, sales, and administration" of the insurance product (id., ¶ 38) with specified responsibilities.  (Id., ¶ 41.)  Amwins characterized itself as the "exclusive" wholesaler of the insurance product.  (Id., ¶ 39.)  The PAA designated Peleus as the program's underwriter, responsible for bearing the primary risk of the product and transferring some of the program's risk to various reinsurance companies (id., ¶ 43) with specified responsibilities (id., ¶¶ 42-46.)

Capital Shield soon came to believe that Amwins had failed to fulfill its obligations under the PAA.  (Id., ¶ 52.)  Amwins "did not establish the promised national platform for commercialization of [the insurance product], failed to provide necessary staff training, and conducted minimal marketing efforts, while also limiting sales to the part-time effort of a single person at Amwins along with the extremely limited sales efforts of a few other Amwins employees."  (Id., ¶ 53.)  Amwins never sold a

single insurance product, and all sales came entirely from Capital Shield's own marketing efforts.  (Id., ¶ 57.)

Capital Shield contacted Marsh & McClennan Companies ("Marsh"), "the largest insurance company in the world and also Amwins' largest insurance brokerage business client," to secure the re-launch of its new product (Id., ¶ 59.)  Although Capital Shield included Amwins in communications with Marsh, Amwins became less responsive to communications in June, July, and August of 2023.  (Id., ¶ 60.)  In late July 2023 Marsh agreed with Capital Shield to re-launch the product (id., ¶ 62) and Capital Shield soon had a "cemented" relationship with Marsh.  (Id., ¶ 64.)

While the discussions between Capital Shield and Marsh intensified, Peleus expressed multiple concerns.  Peleus was increasingly adamant about not losing the out-of-pocket money it had spent on the new product program; increasingly eager to get the new product sold in the marketplace; and increasingly frustrated with "Amwins' gross failure to even attempt to execute its sales and marketing requirements under the PAA." (Id., ¶ 65.)  On July 20, 2023, Peleus sent an email to Capital Shield communicating its concerns about Amwins' efforts.  (Id.).  On August 8, 2023, Peleus offered "to utilize its own marketing resources to work directly on distribution," even though this fell outside of the scope of its obligations under the PAA and offered to assist Capital Shield with the Marsh product launch.  (Id., ¶

- 5 -

66.)  On August 11, 2023, Peleus "abruptly rescinded its offer" to provide marketing resources and informed Capital Shield that Amwins would no longer be marketing the insurance product.  (Id., ¶ 67.)  Amwins itself had never directly communicated to Capital Shield its intent to abandon its contractual marketing obligations (id., ¶ 68), but throughout August 2023, Amwins "persisted in its wholesale abdication" of its marketing obligations under the PAA. (Id., ¶ 69.)

The TAC alleges that by the time Peleus rescinded its offer to provide marketing resources (on August 11, 2023), Amwins and Peleus had already made a "backchannel agreement" to drive Capital Shield's insurance product out of the market.  (Id., ¶¶ 68-69.) Discussions concerning this backchannel agreement had begun on August 3, 2023, when Peleus representatives met with representatives from Amwins at Amwins' North Carolina office. (Id., ¶¶ 87-88.)  The TAC does not recite what occurred at this meeting because Peleus "refus[ed] to provide Capital Shield with the details of the meeting[.]" (Id., ¶ 88.)  Nonetheless, the TAC alleges that shortly thereafter Peleus "embraced Amwins' refusal to provide any marketing resources or sales efforts to advance the Capital Shield program." (Id., ¶¶ 89-91.)  In response to the motions to dismiss, Capital Shield argues that the antitrust agreement between Peleus and Amwins had been "cemented" by August 11, 2023.  (Doc. #84, p. 11.)

On August 30, 2023, Capital Shield sent an email to Peleus setting forth Amwins' efforts to thwart the Marsh product launch. Peleus did not respond, but instead permanently canceled all biweekly conference calls between the parties. (Doc. #54, ¶¶ 72-73.)  Additionally, Peleus failed to provide promised "deliverables" related to and necessary to finalize the Marsh product launch despite Capital Shield's numerous email reminders, and "summarily refused" Capital Shield's requests "to pursue Marsh to fill Amwins' failed role as the wholesale insurance broker." (Id., ¶¶ 72-73, 92-94.)

The PAA gave all three parties the right to terminate the agreement at any time without cause. (Doc. #54-5 at p. 23.)  Both Amwins and Peleus provided separate notices of termination, but Capital Shield never did despite its admitted efforts to replace Amwins with Marsh in the insurance product's re-launch.

On August 31, 2023, Amwins provided a written notice of termination of the PAA to Capital Shield and Peleus. (Doc. #54, ¶ 96.)  This notice came less than 24 hours before Capital Shield was set to finalize the insurance product launch with Marsh. (Id., ¶¶ 96-97.)  The termination triggered a 180-day "runoff period" among the program's reinsurers that precluded Capital Shield from issuing new policies. (Id., ¶¶ 83-84.)  Amwins' termination also triggered a "Termination Fee" clause under the PAA that would require Capital Shield to pay Peleus $100,000 to reenter the

insurance market within six months of the termination date. (Id., ¶ 73.)  In Capital Shield's view, the Notice of Termination was based on false information. (Id., ¶¶ 83-84.)

On September 8, 2023, Capital Shield emailed Amwins "outlining the severe harm and damage Amwins caused Capital Shield," and on September 13, 2023, Capital Shield asked Amwins to "immediately rescind" the termination. (Id., ¶¶ 76-79.) On September 18, 2023, Amwins sent a "Notice of Rescission of Notice of Termination" to Capital Shield. (Id.) Even after Amwins rescinded its Notice of Termination, however, it continued to breach its contractual duties to market the insurance product under the PAA. (Id., ¶ 80.)

Throughout September 2023, Capital Shield repeatedly emailed Peleus with "material questions about the program." (Id., ¶ 90.) Rather than providing Capital Shield with written answers, Peleus "arranged for a Teams conference call with Capital Shield and, without ever notifying Capital Shield, attempted to orchestrate the inclusion of Amwins on the call." (Id., ¶ 103.) Capital Shield declined to participate in any call including Amwins and implored Peleus to respond with written answers to its "material questions." (Id.).

On September 29, 2023, Peleus sent a letter to Amwins and Capital Shield noticing its intent to terminate the PAA, making clear that "Capital Shield was prohibited from issuing any new

insurance policies or placing any new insurance with Peleus."
(Id., ¶ 105.)   The Notice of Termination was based on Capital
Shield's failure to maintain E&O insurance—a material breach under
the PAA.  (Doc. #54-23 at p. 335.)

Additional facts set forth in the TAC are also discussed in
Section III of this Opinion and Order.

**II.**

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint
must contain a "short and plain statement of the claim showing
that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).
This obligation "requires more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action will not
do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)
(citation omitted).  Additionally, "more than an unadorned, the-
defendant-unlawfully-harmed-me accusation" is required.  Ashcroft
v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).  This
"more" does not translate into "longer", however, since the bottom
line is that a "complaint is a short, plain, direct statement of
allegations of fact sufficient to create a facially plausible claim
for relief and sufficient to permit the formulation of an informed
response."  Trump v. New York Times Co., No. 8:25-CV-2487-SDM-NHA,
2025 WL 2680597, at *2 (M.D. Fla. Sept. 19, 2025).

Rule 12(b)(6) allows a defendant to seek dismissal of a
complaint for failure to state a claim upon which relief may be

granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint must be "plausible" and "must be enough to raise a right to relief above the speculative level." Twombly at 555.  The facts alleged in the complaint must be accepted as true and construed in a light most favorable to plaintiff. ECB USA, Inc. v. Savencia Cheese USA, LLC, 148 F.4th 1332, 1347 (11th Cir. 2025).  The Court uses a two-step process to resolve such a motion to dismiss: The Court first determines what must be pled for the cause of action, then determines whether the well-pleaded factual allegations plausibly suggest an entitlement to relief. Caterpillar Fin. Services Corp. v. Venequip Mach. Sales Corp., 147 F.4th 1341, 1347 (11th Cir. 2025).

Both Defendants also argue that the conduct alleged in Count I falls within the Sherman Act exemption created by the McCarran-Ferguson Act.  Whether conduct is exempted from Sherman Act liability is an affirmative defense, and an affirmative defense need not be negated in a complaint.  "A plaintiff is 'not required to negate an affirmative defense in [its] complaint.'  Thus, '[g]enerally, the existence of an affirmative defense will not support a motion to dismiss.'" Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 609 F. Appx 972, 976 (11th Cir. 2015) (citations omitted).  Despite this, a complaint may be dismissed if an affirmative defense clearly appears on the face of the

complaint.  <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1175 (11th Cir. 2011); <u>Jackson v. BellSouth Telecomms.</u>, 372 F.3d 1250, 1277 (11th Cir. 2004) (affirmative defense "may be considered in resolving a motion to dismiss when the complaint affirmatively and clearly shows the conclusive applicability of the defense to bar the action.").

## III.

Defendants' motions to dismiss assert that Count I of the TAC is simply an attempt to recast a contractual dispute as an antitrust conspiracy, and that Court I fails to plausibly state a Sherman Act antitrust claim.  Capital Shield maintains that Count I properly alleges an anticompetitive vertical conspiracy by Defendants in violation of Section 1 of the Sherman Act.  (Doc. #84, p. 1.)[2]

The first step resolving the motions is straightforward here. Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  The elements of a § 1 claim are: (1) a conspiracy that (2) unreasonably (3) restrains interstate or foreign trade.  <u>Quality Auto Painting Ctr.</u>

---

[2] An agreement between businesses operating at different levels of the same product's production or distribution chain is known as a "vertical" agreement."  <u>Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.</u>, 376 F.3d 1065, 1071 (11th Cir. 2004).

of Roselle, Inc. v. State Farm Indem. Co., 917 F.3d 1249, 1260 (11th Cir. 2019) (citation omitted).  No party disputes that these are the appropriate elements which must be sufficiently pled.

The second step - determination of whether the well-pleaded factual allegations plausibly suggest an entitlement to relief – is the focus of the disputes in this case.  Defendants argue that Capital Shield has failed to sufficiently plead any of the elements of its antitrust violation claim.  Capital Shield argues that it has sufficiently pled all the elements of the claim.  The Court concludes that the TAC fails to plausibly assert a conspiracy to restrain trade.

"A section 1 plaintiff must prove an agreement between two or more persons to restrain trade, because unilateral conduct is not illegal under section 1. . . .  Thus, the first element of a section 1 claim is proof of an agreement to restrain trade." Levine v. Cent. Florida Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996) (citations omitted).  But not every instance of cooperation between two people constitutes a conspiracy under §1. Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 189-190 (2010).  "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  Twombly, 550 U.S. at 556.  As with any claim, "'[p]lausibility' does not mean 'probably,' but 'it asks for more than a sheer possibility that a defendant has acted unlawfully.'"

Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos, 605 U.S. 280, 291 (2025) (quoting Iqbal, 556 U.S. at 678). Thus, the TAC must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Caterpillar Fin. Services Corp., 147 F.4th at 1347.

Direct evidence of a Sherman Act conspiracy is not the norm, and most antitrust conspiracies are alleged and established using circumstantial evidence. DeLong Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499, 1515 (11th Cir. 1989). Not surprisingly, the TAC fails to allege direct factual evidence sufficient to support a plausible conspiracy claim. Rather, the TAC alleges circumstantial evidence which Capital Shield argues is parallel conduct and corroborative "plus factors." (Doc. #84, pp. 26-31.)

Defendants agree that circumstantial evidence may be sufficient to allege a plausible Sherman Act conspiracy. This circumstantial evidence may include "parallel conduct" if accompanied by "some further factual enhancement" (i.e., "plus factors"). Quality Auto Painting, 917 F.3d at 1261; Twombly, 550 U.S. at 557. Both Defendants argue, however, that the TAC lacks allegations which are sufficient to plausibly state a §1 Sherman Act claim.

Capital Shield identifies Defendants' increasing

unresponsiveness, disingenuous emails, synchronized termination actions, joint exclusionary communications and meetings, and leveraging of breach claims as sufficient parallel conduct set forth in the TAC. Capital Shield also identifies four "plus factors" to show that Defendants' conduct was indicative of a conspiracy: (1) a shared financial motive, (2) actions against both Defendants' self-interest, (3) Defendants' opportunity for collusion through backchannel communications, and (4) the lack of an independent business justification for "sabotaging" the Capital Shield insurance product. (Id. at pp. 29-31.)

For the reasons set forth below, the Court concludes that Count I fails to plausibly set forth a §1 Sherman Act conspiracy.

According to the TAC, there were no relevant parallel functions or obligations required of Amwins and Peleus by the PAA. The PAA designated Amwins and Capital Shield as co-program administrators and Peleus as the underwriter for the new insurance product. (Doc. #54, ¶ 38.) The relevant contractual duties and functions of these two entities did not overlap.

While Capital Shield soon came to believe that Amwins was not performing its obligations under the PAA, it had no such concerns about Peleus' efforts to perform its contractual obligations. Indeed, the TAC asserts that Peleus also grew increasingly frustrated with Amwins' failure to perform its contractual obligations, as reflected in a July 20, 2023, email. (Doc. #54,

¶ 65.)

Because of Capital Shield's concerns about Amwins, Capital
Shield began negotiating with Marsh to essentially take over
Amwins' contractual obligations. No similar efforts to oust Peleus
were begun by Capital Shield.

Capital Shield's efforts to replace Amwins with Marsh
followed a different path than its prior replacement of MarketScout
with Amwins. Capital Shield had terminated its contract with
MarketScout before entering into the PAA with Amwins. (Id., ¶¶
34-35.) There is no allegation in the TAC that Capital Shield
took steps to terminate Amwins participation in the PAA. Rather,
Capital Shield just went about replacing Amwins with Marsh and
demanding Peleus' assistance in doing so. (Id., ¶¶ 72-73.)

Despite planning to replace Amwins with Marsh, Capital Shield
included Amwins in its communications with Marsh but complains
that Amwins' decreasing responsiveness is evidence of a Sherman
Act conspiracy with Peleus. (Id., ¶¶ 59-60.) Rather than creating
an inference of a Sherman Act conspiracy, Amwins' decreasing
responsiveness is more reasonably the result of Capital Shields'
efforts to replace Amwins.

With this background, Capital Shield asserts that a Sherman
Act antitrust conspiracy began at the August 3, 2023, meeting. By
that date, Amwins and Peleus had begun discussions which ultimately
resulted in a "backchannel agreement" to drive Capital Shield's

investment theft insurance product out of the market. (Id., ¶ 88.)
Significantly, however, Capital Shield was not in attendance at
the meeting and does not purport to know what occurred there.
Nonetheless, Capital Shield argues that both Defendants "engaged
in exclusive in-person meetings and backchannel conversations"
excluding Capital Shield, which it asserts evinces their parallel
conduct. (Doc. #84, p. 28.)  The Court is not convinced.

This argument ignores not only Capital Shield's admitted lack
of knowledge as to the events during the meeting but the
substantial variances between Peleus and Amwins' business
decisions during that same period.  Peleus continued to provide
"strong support" for the Marsh product launch following the August
3, 2023, meeting, while Amwins had "wholesale abdicated" its
marketing responsibilities under the PAA.  (Doc. #54, ¶¶ 66, 69.)

Rather than acting in concert with Amwins, Peleus offered to
take over Amwins' responsibilities under the PAA, then changed its
mind.  On August 8, 2023, Peleus offered to use its own marketing
resources to work directly on distribution of the product, but on
August 11, 2023, Peleus rescinded its offer and informed Capital
Shield that Amwins would no longer be marketing the insurance
product.  Amwins did in fact abdicate its marketing obligations
under the PAA.  (Id., ¶¶ 66, 68.)

Capital Shield also contends that both Defendants grew
"increasingly unresponsive" to Capital Shield's inquiries during

"critical periods," particularly leading up to the Marsh product launch in September 2023.  (Doc. #84, p. 28.)  The TAC does not adequately support this argument as a basis to infer an anticompetitive conspiracy.

On August 30, 2023, Capital Shield sent an email to Peleus detailing Amwins' efforts to thwart the Marsh product launch. (Doc. #54, ¶ 72.)  Peleus did not respond but permanently canceled all biweekly conference calls between the parties, failed to provide promised deliverables related to and necessary to finalize the Marsh product launch, and refused Capital Shield's requests "to pursue Marsh to fill Amwins' failed role as the wholesale insurance broker." (Id., ¶¶ 73, 97.)  But Capital Shield had never given notice of termination to Amwins so that it could be replaced by Marsh, and there was no PAA obligation for Peleus to assist Capital Shield in such a replacement venture.  The conduct by Peleus in response to Capital Shields' unilateral effort to replace Amwins was not contrary to its contractual obligations nor supportive of the alleged Sherman Act conspiracy.

Capital Shield nevertheless asserts that Amwins' and Peleus' "synchronized termination actions" constituted parallel business conduct indicative of a conspiracy. (Doc. #84, p. 28.)  The Court does not see it that way.

While Capital Shield was attempting to replace Amwins with Marsh without providing a notice of termination, Amwins provided

(then rescinded) a notice of termination to Capital Shield. On August 31, 2023 - a day after Capital Shield emailed Peleus detailing Amwins' efforts to thwart the Marsh product launch and less than 24 hours before Capital Shield was set to finalize the product launch with Marsh - Amwins provided a written notice of termination of the PAA to Capital Shield and Peleus. (Doc. #54, ¶ 73.) On September 8, 2023, Capital Shield advised Amwins of the severe harm and damage Amwins had caused Capital Shield, and on September 13, 2023, asked Amwins to "immediately rescind" the termination notice. (Id., ¶¶ 76, 78.) On September 18, 2023, Amwins did so. Peleus continued performing under the PAA project during these termination notice activities. (Id., ¶ 79.)

The PAA required Capital Shield to maintain a business insurance policy. Amwins intentionally notified Peleus of "a nonexistent business insurance cancellation by [Capital Shield] . . . to prompt Peleus to accuse [Capital Shield] of breaching the PAA." (Doc. #84, p. 29.) On September 29, 2023, approximately a month after Amwins' August 31, 2023, Notice of Termination, Peleus provided its own notice of termination to Capital Shield. (Doc. #54, ¶ 105.) Providing false information is not indicative of conduct by a fellow conspirator. Neither Peleus' nor Amwins' conduct regarding termination is supportive of a reasonable inference of a Sherman Act conspiracy.

Last, Capital Shield contends that Defendants engaged in the

similar conduct of sending disingenuous emails regarding the insurance product's progress while "failing to take any action to advance [the insurance product]". (Doc. #84, p. 28.) The TAC alleges that "Peleus deliberately protracted and delayed any responses based upon its acute awareness as to the inherent time-sensitive imperatives in salvaging the Marsh opportunity" (Doc. #54, ¶ 101.) The TAC provides insufficient facts to support such conduct.

The TAC asserts that throughout September 2023, Capital Shield repeatedly emailed Peleus with material questions about the program, to which it wanted written answers. Instead, Peleus arranged for a conference call between itself, Capital Shield, and Amwins. (Id., ¶ 103.) Capital Shield argues that Peleus' "attempt[] to secretly include Amwins in a conference call on September 18, 2023 following Amwins' illicit termination" (Doc. #84, pp. 28-29) was conduct indicative of a Sherman Act conspiracy. Nothing about Peleus' effort to include Amwins – which was still a party to the PAA – suggests an agreement to interfere with the release of the insurance product.

As for "plus factors," Capital Shield argues that Amwins and Peleus shared a common motive to enter the antitrust conspiracy and that Defendants actions were against their own interests and lacked an independent business justification. (Id., pp. 29-30.) Neither argument is supported by the TAC.

According to the TAC the "motive underpinning Amwins' conspiracy with Peleus to eliminate the Capital Shield program at any cost was the immediate risk to Amwins' disclosed multi-billion-dollar relationship with Marsh." (Doc. #54, ¶ 71.) Peleus, on the other hand, was allegedly concerned about losing the out-of-pocket expenses it had spent on the program. (Id., ¶ 65.) Thus, Defendants had separate and independent motivations and individualized business and financial interests.

The substantial variances in the actions of the alleged conspirators fatally undercut an inference of a conspiracy. Indeed, the more reasonable inferences are those asserted by Peleus – that Peleus came to act as a mediator between Amwins and Capital Shield and later simply decided to cut its losses. (Doc. #75, p. 12.) Because the TAC fails to set forth a plausible § 1 Sherman Act violation, Count I must be dismissed without prejudice.

Having found that the conspiracy element has not been plausibly set forth, the Court must also find that the TAC also fails to plausibly set forth the second and third elements of the Sherman Act claim. Additionally, without a properly stated conspiracy claim it cannot be determined whether Count I is clearly precluded by the McCarran-Fergusson Act, 15 U.S.C. §§ 1012.[3]

---

[3] This Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act

Additionally, in the exercise of its discretion the Court declines to exercise jurisdiction over the remaining state law claims in the absence of a federal claim.  28 U.S.C. § 1367(c).  A district court is "encouraged" "to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." Harris-Billups on behalf of Harris v. Anderson, 61 F.4th 1298, 1305–06 (11th Cir. 2023) (quoting Raney v. Allstate Ins., 370 F.3d 1086, 1088–89 (11th Cir. 2004)).

Accordingly, it is now

**ORDERED**:

1. Defendant Amwins' Motion to Dismiss (Doc. #69) is **GRANTED**.

2. Defendant Peleus' Motion to Dismiss (Doc. #75) is **GRANTED**.

---

specifically relates to the business of insurance."  15 U.S.C. § 1012.  The Act allows "insurers to share information relating to risk underwriting and loss experience without exposure to federal antitrust liability and to preserve for the states the power to regulate the insurance industry."  Gilchrist v. State Farm Mut. Auto. Ins., 390 F.3d 1327, 1330 (11th Cir. 2004) (citing Union Labor Life Ins. v. Pireno, 458 U.S. 119, 133 (1982)).  Accordingly, the Act exempts the activities of insurers from antitrust liability when "(1) the challenged activity is part of the 'business of insurance'; (2) the challenged activity is regulated by state law; and (3) the challenged activity does not constitute a boycott of unrelated transactions."  Gilchrist, 390 F.3d at 1330.  The Act does not exempt all activities undertaken by insurance companies, exempting only the "business of insurance" and not the "business of insurers."  Grp. Life & Health Ins. v. Royal Drug Co., 440 U.S. 205, 211 (1979).  To determine whether the challenged activity is within the business of insurance, courts consider whether the practice has "the effect of transferring or spreading a policyholder's risk", is "an integral part of the policy relationship between the insurer and the insured," and is "limited to entities within the insurance industry."  Gilchrist, 390 F.3d at 1331.

3. Counts I through IV of the Third Amended Complaint are dismissed without prejudice.

4. Plaintiff may file a fourth (and final) amended complaint within twenty-one days of the date of this Opinion and Order.

**DONE AND ORDERED** at Fort Myers, Florida, this  30th  day of October, 2025.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Parties of record